Good morning, counsel. We're ready for our second case today, which is 4-16-0069, and that is the case of Mushrush v. Feinberg. And we have the appellant present by Mr. Wilson, is that correct? And the appellee present by Mr. Brinkman as well as Ms. Sonny. Is that how you pronounce it? Sonny. Sonny, okay, thank you. And have you divided up your time? Yes, we talked about having Mr. Brinkman proceed first and take some time to speak, and I have waited a few minutes, that's right. And we've talked to him. Okay, so you're good. Okay, all right, thank you. You may proceed, counsel, thank you. Court, please. Counsel, I'm Paul Wilson from Rantoul, Illinois. I represent the plaintiff, Jim Mushrush. This is a case that basically went to trial on two counts, and the other six did not make it to the jury. The cases that I would like to, or the issues I would like to address first is the issue of informed consent. And essentially, the plaintiff had to establish that the physician had a duty to disclose certain risks that would arise from the proposed surgery. Secondly, that the physician either failed or disclosed those risks, and that as a direct and proximate result thereof, the patient consented to certain procedures that he would not otherwise have consented to had he been given adequate disclosures. And finally, that he suffered injury. In this case, three of those counts related to the counts are the ones that actually went to trial, which would have been the count against Christie Clinic, LLC, which was the employer of the physician involved. The second was the count against Dr. Feinberg. The third was against Presence, who was claimed to be acting through their agent, Dr. Feinberg. Now, the count for the informed consent against Presence was granted a summary judgment motion against plaintiff in favor of Presence. And I think that Presence has tried to clarify that a lot of the documentation here is Provena. Traditionally, that started out, in my experience, as Mercy Hospital. Then it became Provena Hospital, and much of the documentation reflects Provena. And finally, it ended up as Presence. So we have referred to him as Presence throughout the proceeding. In any event, a summary judgment motion was granted to him. We assert improperly. The factual scenario that developed here is that although in some cases you're not required to have expert evidence as to the informed consent, we did. We had Dr. Fred Simon, a surgeon of about 35 years from San Diego, California, testified that Dr. Feinberg had failed to adequately disclose the material risks of the proposed surgery. Now, the surgery was going to happen. Everybody agreed to that. Mr. Mushrush needed to have his gallbladder removed. And when he first met with Dr. Feinberg, he said, just open me up and yank it out like you've done in the past. Dr. Feinberg had previously done six or seven abdominal surgeries on Mr. Mushrush. And they'd all happened at Presence. The discussion occurred in a hospital room when Mr. Mushrush was being discharged by Dr. Ho, another Christie physician who had been taking care of him for a few days. Dr. Feinberg at that point indicated that he gave a disclosure, informed consent if you will, to Mr. Feinberg. Mr. Feinberg, sorry, Mr. Mushrush testified as well as his wife who was present at that time in that hospital room that Dr. Feinberg hadn't disclosed any material risks. The only thing he said is it's easier to do laparoscopic surgery as opposed to an open colostectomy. Mr. Mushrush at that point declined to have surgery. A few days later he showed up at Dr. Feinberg's office and signed a consent to the surgery. And Dr. Feinberg was not present so there was no discussion between the parties at that point. So he went in for surgery a couple of days later and he signed a consent form. This all occurred at presence. The consent form bore a label on it that said Provena Medical Center or something like that identifying Provena. It was taken by a nurse, Nancy Tickler, who was according to Dr. Feinberg an employee of presence. So then he underwent the surgery and Dr. Feinberg proceeded to perform a laparoscopic surgery which just involved a couple of incisions, maybe two to four incisions that instruments were inserted through and that way they take out the gallbladder. Dr. Feinberg's deposition was reviewed by Dr. Simon to determine or ascertain whether or not there was a likelihood under 2622 to file a cause of action against Dr. Feinberg. Dr. Simon did not disclose material risks to the plaintiff. He basically, Dr. Simon basically indicated that there was no disclosure of a material risk that there's an increase or an augmented possibility of damage to the patient by not disclosing the greater risk of laparoscopic surgery to be performed on a person who had prior abdominal surgeries due to the development of adhesions which are basically scar tissue developing inside the body, the peritoneal cavity, that basically result from any prior laparoscopic surgery. There was no disclosure of those risks in his deposition. Now finally in his second or third testimony at trial suddenly Dr. Feinberg knew that there was a greater risk and knew the percentages even though he declined to answer those questions in his deposition saying he didn't know or objecting to my question that's being made. Dr. Simon didn't think the questions were vague. He didn't think the doctor missed it. And one of the big problems you have where there are a bunch of adhesions is when you go in, you're not opening the cavity up. There's a risk with those adhesions of nicking the colon or the bowel and causing a leak. And a lot of times those adhesions are nucleophile and pancreatic enzymes which do their job outside of the intestine of eating tissue just like it's supposed to do inside the intestine. So there was a failure to, asserted by Dr. Simon, to inform him of the greater risks of performing laparoscopic surgery. And secondly, failing to advise him of the increased risk with laparoscopic surgery with dense adhesions. And in the testimony or the operative reports talked about the intense dense adhesions that Dr. Feinberg had to get through. So there was also a Dr. Simon, Dr. Feinberg, to adequately inspect the colon to make sure there hadn't been any inadvertent enterotomies. In other words, one that was not purposeful. And nobody's alleging that Dr. Feinberg on purpose cut this guy's colon or small intestine. So in any event, with that, Dr. Feinberg removed the gallbladder. Wasn't this informed consent issue submitted to the jury? Not as to presence. As to presence, the trial judge granted summary judgment in count four. The other two, as to Christie Clinic LLC and Dr. Well, in view of that, what was the alleged negligence then of presence? Wasn't Feinberg working there with presence? I mean, how can a jury Well, I was going to get to that point because part of informed consent then is the presentation to the jury. And in the presentation to the jury, Dr. Feinberg said there was adequate consent. Dr. Simon says there was not. Dr. Ward, one of presence expert witnesses, although he's essentially a has the qualifications of a surgeon, and he testified essentially that he thought that the informed consent was adequate. So there was a factual dispute as to that. And nonetheless, the trial court allowed summary judgment, which contravenes the basic My question is, given what the jury said, how could the courts granting summary judgment be error in this context? Because it should have been determined by a jury and not The jury did determine it. I say, what's your prejudice, given that the jury decided that the informed consent was apparently They rejected your informed consent argument with regard to Dr. Feinberg. How does it withstand with regard to presence? Because what was presented to the jury after discovery was concluded where both presence and Feinberg and Christy were asked in interrogatories and a request to produce, do you have any facts or documents relating to Dr. Simon? The answer, we didn't get one from None at this time. Investigation continues. Well, You're not answering my question, counsel. My question is, given the jury's decision that there was no failure of informed consent, as far as Dr. Feinberg was concerned, how could we find error in the trial court's granting summary judgment with regard to presence? Very easily, Judge. We pointed out in our brief because what happened is Mr. Brinkman then cross-examined Dr. Simon. And he questioned him about, A, you went to all these different colleges to get your medical degree, yes. And you had rejections from a number of colleges to get into medical school, yes. Secondly, the first time he took the surgical board, he didn't pass it. Now, no question about it, he passed it. He completed medical school, obviously. And secondly, he passed the board for surgery a number of times over the last 25, 35 years. And none of this was disclosed to the plaintiff. And an objection to relevance was made, which the trial court denied. The trial court later said, well, you never objected. Well, we did. And this court's decision in Downey, I think, bears right on point. And that is, what do you do? Do you put plaintiff's counsel in a position where they object to each and every question, hammering it in to the jury about, this is really important. You guys listen to this and emphasize it. And the decision in Downey goes right on point, even though that case involved disclosing that the defendant's father was a minister. But we cited two other cases directly on point, saying that it's reversible error to allow this sort of information in, when in fact the doctor had completed medical school and he had been a number of times passed and repassed the surgical boards. So the whole purpose of this then was to, if you will, besmirch Dr. Simon's credibility and his adequacy as a surgeon. I think Downey talks about it. I think the other two cases that we cited are directly on point in terms of having filled boards. And we likened it in our argument to basically the fact that a judge may not have gotten into the law school of his choice. Ooh, let's besmirch his decisions at a later time. It doesn't make sense. It's not relevant. And it's so inflammatory and so prejudicial. But it's incumbent upon us to establish that the prejudice basically deprived him of a fair trial. And that's what Downey said and that's what these other two cases said that were directly on point in terms of credentialing and the schools you attended. And so what we had is we had basically Feinberg's word against Simon's word about the propriety of the informed disclosure. And as Simon said, well, there was a disclosure, but it wasn't informed. Because Feinberg admitted he didn't know what the increased risk was. And as Simon aptly put in his testimony, he said, you know, if he didn't know then, how could he have given informed consent? If he couldn't apprise the patient of the risks, how can you do that when you don't know what the risks are yourself, doctor? So the prejudice, I think, was overwhelming. It was trumped, if you will, by the trial judge, who at least on two occasions complimented the defense counsel on his wonderful cross-examination of Dr. Simon. With information that was purposely withheld from plaintiff, although requested in discovery. And what the trial judge says is, well, you know, if you'd objected to that, I would have granted the motion and they couldn't have got that information anyway. Well, they didn't object. And so it was improperly out there. But I think that bespeaks the attitude of the trial judge. And frankly, he chastised the defense counsel for hiding this information that was properly requested. What does he chastise me for not properly vetting my witness? For not preparing my witness? And I think Downey talks about that in terms of, you know, you're entitled as a lawyer to go along with that dumb and handy when you've got a disclosure or non-disclosure in discovery. Where there's A, materials that should have been disclosed, and even at that time they weren't, there's a duty under 413 to supplement that discovery. So, our position, based upon essentially the trial court agreeing that it was a wonderful job of impeaching Dr. Simon. Prejudice, I think, is incredible. And for that reason, I would think that we're entitled to a new trial. Did you raise that issue in a post-trial motion? I did. Both the issue of the question about not getting into medical school initially and the exam, not passing the exam initially? Yes, we raised that in a motion to strike and during trial. What about the post-trial motion, counsel? That was the question. The question was post-trial motion. My question was, did you raise it in a post-trial motion? We re-raised it in a post-trial motion, yes. Thank you. I'm, I should say at this point since I've got the ambulance. You have until the red light, you have until the red light comes on, counsel. I was going to say I would re-raise all of the issues that I've raised in my brief. I don't intend to waive those by not addressing them since I'm going to run out of time. Okay. So if we've got that, all of the summary judgment motions, all the directed verdicts are out. Because we've now established approximate cause and negligence. And I've addressed both those issues, approximate cause and negligence in the brief. So I won't spend any more time with that. But the bottom line is that was, I think, a huge error that entitles us to a completely new jury trial as to all eight counts that were. Thank you. Thank you, counsel. You'll have more time on rebuttal. Mr. Brinkman. Thank you, Your Honor. May it please the Court, William Brinkman on behalf of Dr. Feinberg and Christie Clinic. Your Honor, none of the issues raised by the plaintiff in this case warrant reversal of the verdict at the trial court level. If I understand the argument on informed consent, this is an argument directed against Presence Hospital and not directed against Dr. Feinberg or Christie Clinic. This issue was contested questions of fact, expert witness testimony on both sides. The plaintiff himself testified he was aware of the risk of bowel injury from this type of surgery. The jury heard all the evidence that was submitted to the jury, and the jury found that the informed consent was proper. What about the fact that the doctor admitted that he may have nicked the patient's bowel? Does that get them over the hump with respect to proximate cause? That's one of the issues raised in this case, the proximate cause question. Here, Your Honor, Dr. Feinberg, apparently according to the testimony of the wife, after the injury was discovered about three days after the surgery, according to her testimony stated that he must have nicked the bowel during surgery. The undisputed evidence from even Dr. Simon, the plaintiff's expert, was that an injury to the bowel is one of the recognized complications that can occur during this type of surgery. It's something that can occur without negligence, even though proper care is given. The directed verdict on proximate cause was granted by the trial court because Dr. Simon was never asked and never testified that any of the things he thought that were done negligently were a proximate cause of the injuries in this case. That was the basis for the proximate cause ruling. And the difference between doing the surgery laparoscopically or doing it as an open procedure, which was one of the criticisms Dr. Simon had, really was of no import, because even Dr. Simon agreed that either way you do that surgery, bowel injury is one of the recognized complications, something that can occur despite proper care. The first two issues that were raised by the plaintiff as error and reversible error was the court's refusal to enter a judgment on liability against Dr. Feinberg and Christie Clinic because of discovery sanction, or on the basis of a discovery sanction. The first motion for sanctions pertains to a failure to supplement an interrogatory answer that was asked at the beginning of the case in 2013. Have you had other medical malpractice suits filed against you? Dr. Feinberg truthfully answered that question in 2013. About a year and a half later, in 2014, there was a new suit filed against Dr. Feinberg. That suit was filed in Cook County. After several months, Cook County was transferred down to Champaign, Illinois. We were retained to represent Dr. Feinberg and entered our appearance in February of 2015 with respect to this new case. We didn't supplement the answer to the interrogatory, which was have you had any medical malpractice suits filed against you. I acknowledge that this was an oversight. I should have supplemented the interrogatory, I think, on a technical note. But the sanction that was requested with entry of judgment on liability was found by the court not to be warranted. The court did not use its discretion. It did a very thorough analysis of this issue. It found that the new case was a totally different surgery, totally different circumstances. The judge gave the plaintiff the option of either a continuance or to re-depose Dr. Ward as a discovery sanction. Who is Dr. Ward? Dr. Ward was the expert, not on behalf of presence, but on behalf of Christie Clinic and Dr. Feinberg. And he's a general surgeon who does cholecystectomy surgery. They call that removed surgeries. Plaintiff chose not to take a continuance. Plaintiff chose not to re-depose Dr. Ward, who was present at the courthouse. We could have done that. There were court reporters available. He chose not to do that. But this information in the lawsuit was not something that was likely admissible in any event. So the only argument made by the plaintiff was that this knowledge by Dr. Ward about the lawsuit might have changed his opinions. So that was the argument. But the plaintiff did not take up the option of a continuance or re-depose Dr. Ward. Certainly this discovery violation does not warrant an entry of judgment on liability against Dr. Feinberg and Christie Clinic. There was no reversible error by what the court did ruling on this motion for sanctions, which was filed on the first day of trial. The second motion for sanctions has to do with the interrogatory at the beginning of the case, please state all facts known to you relating to Dr. Fred Simon. At that time we had no information. We indicated that investigation continues. We later took Dr. Simon's deposition. We did not supplement the answer to the interrogatory. Judge Jones did comment during the trial when we had arguments on the motion for sanctions that this interrogatory was overly broad. If we had made an objection, he would have sustained that objection. Lesson learned for me is this is an improper interrogatory. Not only is it overly broad, but it invades the attorney work product. Rule 213G states that information regarding an opposing witness expert witness, opposing party's expert witness, does not need to be disclosed. We're not required to telegraph our punches, so to speak, to give the other side advance notice of what our line of cross-examination is going to be. What's your position on opposing counsel's representation that the case law establishes that this was an improper inquiry on your part as to whether or not he had not been admitted to his initial preference for medical school and not passed the test the first time? First of all, the plaintiff only objected to the question about whether the doctor had been rejected by a number of medical schools that he initially applied to. Judge Jones commented that this was a highly relevant part of the case. Judge Jones also commented that the areas of cross-examination that I used when I cross-examined Dr. Simon were the common typical areas that expert witnesses are cross-examined about. So you believe that the questions were appropriate then? Yes, I do. I think that this is a witness who gave incomplete answers on direct examination. His curriculum vitae is incomplete. He doesn't disclose where he did all of his training. When he was asked by Mr. Wilson on direct examination, where have you been, where have you worked since getting out of your residency? He said, I was in New Mexico and California, when in fact he has practiced in eight different states and has licenses in eight different states. This was a witness that started his residency in one medical school and then didn't complete that residency. He then went to the other residency, the University of Massachusetts in general surgery, where he completed the residency. But when he was asked about his postgraduate training, he only mentioned the University of Massachusetts. So this was a witness that was very evasive and was giving incomplete answers. The judge in his discretion felt that these questions were appropriate. And so I don't agree with counsel's argument about the questions being improper in the context of this case. In any event, the argument here by the plaintiff is that this was a discovery violation and that we should have been sanctioned for not supplementing the interrogatory answer. I argued in trial court, I'm arguing here, that we're not required to do that under the rules. The sanction that he requested, again, was an entry of a judgment of liability in the case, which Judge Jones felt was not warranted. A large part of Judge Jones' decision was the fact that all of the information in the answers by Dr. Simon on cross-examination was not only equally available, but more readily available to plaintiff's counsel had he inquired about them. So the decision by Judge Jones, I submit, was proper. Certainly it was not reversible error in this case. It was not an abuse of his judgment. And then the last issue is the claim that summary judgment in favor of Christie Clinic on the institutional negligence claim was error. We've cited authority to this court that an institution, a hospital or a clinic, is liable only if they had reason to know in advance of the care that malpractice is likely to occur. And in this case, Dr. Feinberg did cholecystectomy gallbladder removal surgeries on a routine basis. There was no facts presented to the court on previous surgeries by Dr. Feinberg that would have given Christie Clinic reason to know that they should have disallowed or not permitted him to do this gallbladder removal. The other basis for the claim of institutional negligence was the 17 procedures that took place after the injury was discovered and fixed. This was a very serious problem because there was bio-leaking from the small intestine. And if Dr. Feinberg had closed the wound when he repaired or attempted to repair this, infection would have set in and there would be a high chance of death. So he left the wound open and used a wound vac system. The procedures after that were to change the dressing on the wound vac system as the manufacturer recommends. There wasn't 17 additional surgeries. There were 17 additional procedures to change this dressing. An institution is not required to interject themselves on a daily basis into the care given by the doctors. Again, no advance notice, no facts were presented to the court giving a reason for Christie Clinic to jump in and stop this. So for these reasons, Your Honor, we believe that the verdicts below were proper and we ask that they be affirmed. Thank you, counsel. Any argument, Ms. Sone? Good morning. May it please the Court. My name is Lena Sone. I'm the attorney for presence, previously known as Provena. The main point I want to make before the Court is that, and as Your Justice brought it up, that if the jury verdict is upheld with regard to no proximate cause, thereby not finding Mr. Feinberg negligence, the claims against Provena are moved in this appeal. And I concur with counsel on the institutional negligence argument. Certainly the 17 procedures following the initial procedure or surgery were related to that procedure and they were done in a sterile environment for the care of the patient. They weren't separate procedures. The main issue as to my client to presence is the issue of apparent authority. And we submit that the Court properly granted summary judgment on that issue because of the facts before this case. There's simply no facts that represent – there's no disputed facts on the question of agency. There was a consent form signed by the patient that indicated he understood that most of the physicians at presence were independent contractors. And even if – or regardless of that, their agency relationship made no impact on his care and treatment with that doctor. The other testimony that was relevant that the Court relied upon in granting summary judgment were the party admissions that Mr. Mushrush selected the doctor and not the hospital, which is a key issue on the reliance component of the Gilbert test for apparent authority. And for those reasons, I mean, this case is significantly different than the cases that council sites like York and Kane and this new case, Yarborough, where the – first of all, in those cases, in some – well, at least with Yarborough, I'm sorry, some of those cases, the patient went to the hospital for emergent care and there was no issue of selecting a doctor. In other cases, the doctor was changed at the last minute. And most important, in those cases, the consent form was different than the one present here. So with those points, Your Honor, we request that you affirm the grant of summary judgment for presence. Thank you, counsel. Any further argument, Mr. Wilson? With respect to Mr. Brinkman's argument, there's no dispute that incidental enterotomy is, in fact, a recognized complication of this type of surgery. In and of itself, and counsel is right, Dr. Simon said, yes, it's a recognized complication. But that doesn't obviate the question of what other factors enter into the picture that make it a bad choice to go ahead with laparoscopic procedures. And the major one that Dr. Simon testified to, to this really constituting a deviation from the standard of care, was the fact that there were all these adhesions. And Feinberg knew it. He'd caused virtually all of them in prior surgeries. He had trouble getting in. And then he went ahead and inadvertently nicked the colon. Dr. Simon testified that given the increased risks of perforation of the colon, this elevated it. In other words, you can have a recognized complication, and that complication developing does not constitute deviation from the standard of care, medical negligence. But Dr. Simon went ahead and said, when I talk about medical negligence, I'm talking about a deviation from the standard of care, which gets you over that threshold of, if you will, malpractice. And puts us into a place where motions for summary judgment, motions for corrective verdict, should not be obtained. So we're talking about a number of levels of problems here. Number one, the choice to proceed with laparoscopic surgery without adequately informing Mr. Mushrush. Secondly, when you go in, you commit error because you shouldn't have gone in with all these adhesions. And the third level that Dr. Simon testified to is, when you've got him in there, Simon knew with 17 or 19 more surgical adventures, or misadventures as the case may be, that you don't do that. He tried to suture openings, and the sutures fell out because the tissue had deteriorated so much from days and days of the abdominal cavity being soaked in pancreatic enzymes and bile and eating the tissue. So that was another level of misadventure in terms of the multiple surgeries. He should have sent him to a tertiary care center, Barnes, where he eventually went. And they stopped that sort of continued surgery because Feinberg had another surgery when they transferred him to Barnes, who left him alone for about a year. Then they closed him up. With respect to the question about the propriety of questions about medical schools and passing bars in, O'Brien and Goss are right on point. Right on point. They're in the brief. The chronic decision clearly prompts, if you will, the Reynolds decision that defense relies upon in terms of institutional negligence. And Reynolds basically said, if you knew or should have known. The question is, should have known. And that is, the trial court prevented us from getting MIDUS records, which are computerized records of levels of care. And if the number of surgeries exceeds the number, it should be investigated. So, yes, our position is they should have stopped Dr. Feinberg from continuing these 17 operations where he didn't advise, contrary to the case law we've cited, that this is going to cause infection. It did, with sepsis. And an infectious disease physician was called in from Christie to assist Feinberg and Dr. Haynes. And in terms of institutional control, not only should MIDUS have been given to us, which it was not, but both Dr. Rogers and Dr. Cull from Christie and Presence, respectively, testified to all these internal controls they have to monitor I apologize. Thank you. Thank you, counsel. I take this matter under advisement.